1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 25 CR 00634 |
| | ) | |
| v. | ) | |
| | ) | |
| COLE SHERIDAN, | ) | Chicago, Illinois |
| | ) | October 9, 2025 |
| Defendant. | ) | 10:47 a.m. |

TRANSCRIPT OF PROCEEDINGS - PRELIMINARY EXAMINATION
BEFORE THE HONORABLE HEATHER K. McSHAIN, MAGISTRATE JUDGE

APPEARANCES:

For the Government:      MR. ANDREW S. BOUTROS
                        UNITED STATES ATTORNEY
                        BY:   MR. WILLIAM R. HOGAN, JR.
                        219 S. Dearborn Street, 5th Floor
                        Chicago, Illinois 60604


For the Defendant:      FEDERAL DEFENDER PROGRAM
                        BY:   MR. BENJAMIN HORWITZ
                        55 E. Monroe Street, Suite 2800
                        Chicago, Illinois 60603


FAILURE TO SPEAK DIRECTLY INTO MICROPHONE
RESULTS IN INAUDIBLE PROCEEDINGS AS NOTED.

Transcriber:      KRISTEN J. CARANNANTE, RPR, RMR, FCRR
                  Court Reporter
                  10 Montgomery Place, #1D
                  Brooklyn, New York 11215
                  848.459.3124
                  kjcarannante@gmail.com

* * * * *
PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK:   Case No. 25 Cr. 634, U.S.A. v. Cole Sheridan, for preliminary examination.

THE COURT:   Good morning, counsel.

Please state your appearance for the record, beginning with the government.

MR. HOGAN:   Good morning, your Honor.  William Hogan on behalf of the United States.

THE COURT:   Thank you.

On behalf of the defendant, please.

MR. HORWITZ:   Good morning, Judge.  Ben Horwitz H-O-R-W-I-T-Z, with the Federal Defender Program, on behalf of Cole Sheridan, who is seated to my left.

THE COURT:   Thank you, Mr. Horwitz.

So we are here for a preliminary examination.  I just want to confirm both sides are ready to proceed.

Mr. Hogan?

MR. HOGAN:   Yes, your Honor.

THE COURT:   And Mr. Horwitz.

MR. HORWITZ:   Yes.

THE COURT:   Does either side want to do an opening statement or do you want to proceed straight to the government's case?  Mr. Hogan, what's your preference.

MR. HOGAN:   I would go straight to the case, your Honor.

MR. HORWITZ: Briefly, Judge.

THE COURT: Sure, go ahead.

MR. HORWITZ: Judge, Mr. Sheridan is charged with one count of forcibly assaulting, resisting, opposing, impeding, interfering with a federal officer.

This case is about a protest that occurred at the Broadview detention facility last Friday, that is October 3. You are going to see evidence that a protest was set up outside the facility. Sunny day, beautiful day in suburban Chicago. You are going to see Broadview Police, Illinois State Police, and a variety of federal agents present. There were protesters standing on a grassy area, in the sidewalks, and kind of out and around the space that is defined by fences at the federal facility.

You are going to hear that the alleged victim in this case is the head of Customs and Border Patrol, Greg Bovino, who hopefully the government can explain to us why he was out there in full tactical gear on October 3.

We are going to hear from Agent Jennifer Finerty, and I hope I am pronouncing that correctly, about the testimony that Mr. Bovino has given to her.

I don't think we are going to hear anything to corroborate, anything visual to corroborate the allegation that Mr. Sheridan, a peaceful member of the community, pushed and committed a forcible assault, opposition, impediment, or

interference against Chief Bovino.

The government's burden is low today. It is probable cause, whether a reasonable person believed that Mr. Sheridan committed the crime of which he is accused. We are asking the Court, based on the testimony that you are going to hear, the video that you are likely going to see and, most importantly, what you are not going to see and hear, to find that the government has failed to meet its burden.

THE COURT: Thank you.

Mr. Hogan, you may call your witness.

MR. HOGAN: Your Honor, what we would do, what we would like to do, by way of proceeding today, is rely primarily upon the criminal complaint to which Supervisory Special Agent Finerty, who is here, has already sworn, and supplement that information with some testimony by the special agent.

So, with that, I would like to call Supervisory Special Agent Jennifer Finerty to the stand, please.

THE COURT: Yes.

MR. HOGAN: And for purpose of the record, Ms. Finerty is bringing up there with her copies of her report which have been furnished to the defense counsel, in case she needs to refresh her recollection. I don't intend to ask her to refer to it, but she might, so that's what she's got with her.

THE COURT: Mr. Horwitz, any objection to the witness having that with her already?

MR. HORWITZ: I have no objection to that.

One thing I just do want to raise before we get to the testimony. I'm not sure of all of the folks in the courtroom, but I would just move, under Rule 615, to exclude any other witnesses. I'm not sure if the government intends on calling any other witnesses. I know there are no potential defense witnesses in the room.

MR. HOGAN: No, we have no other witnesses.

THE COURT: Okay. Thank you for confirming that, Mr. Hogan.

So Supervisory Special Agent, could you please -- first of all, just please state your title, name, and agency.

THE WITNESS: Yes. Jennifer Finerty. I am a supervisory special agent with Homeland Security Investigations.

THE COURT: And please raise your right hand.

Do you swear or affirm that the testimony you are about to provide will be the truth, the whole truth, and nothing but the truth, so help you God.

THE WITNESS: I do, your Honor.

THE COURT: Please have a seat.

Mr. Hogan, you may proceed.

MR. HOGAN: Thank you, your Honor.

Finerty - Direct

JENNIFER FINERTY,

DIRECT EXAMINATION

BY MR. HOGAN:

Q.   You have given us your name and your occupation.  Can you tell please tell us how long you have been a special agent with Homeland Security?

A.   Yes.  My name is Jennifer Finerty, and I am a supervisory special agent with Homeland Security Investigations.  I have been a supervisor since April of 2020, and I have been supervising the Child Exploitation Investigations Unit and Computer Forensics.  I have been a special agent with Homeland Security Investigations since January of 2004.

Q.   And directing your attention to last Friday, October 3, were you on duty?

A.   Yes, I was.

Q.   What were you doing?

A.   I was there for supervisory -- I was there in a supervisory capacity.  That was my shift.  I was scheduled to work that particular shift starting at 6 a.m. and then going until 2 p.m.

Q.   When you say you were there, where were you?

A.   At the Broadview Service Staging Area.

Q.   And you were there to supervise what?

A.   The operations of the day and because we knew that there was going to be a protest and they needed extra manpower at the facility that day.

Finerty - Direct

Q.   And were there Homeland Security agents present that day for purposes of crowd control?

A.   Yes, there were.

Q.   And were there other federal agencies present, as well, with agents and officers from those agencies?

A.   Yes, there were.

Q.   Can you tell us what other agencies you recall being there that day?

A.   Yes.  F.B.I. was there, ATF, I believe U.S. Marshal Service, United States Bureau of Prisons, and then the Illinois State Police was also on scene.  I think DEA agents, as well, were there.  And then of course U.S. Border Patrol agents were there, Custom and Border Protection officers, and then as well as our agency, Homeland Security Investigations, enforcement and removal officers, plenty of agencies.

Q.   And in your capacity as a supervisor, what were your duties that day?

A.   That day, any type of incidents that occur, whether it would be assault on an officer or any type of violence, we would be handling those arrests and we would be intaking those arrests.

Q.   Were you outfitted in any kind of protective gear that day or were you dressed pretty much as you are today?

A.   I was dressed tactically and then in my -- I had my vest on, which also said my agency name on it.  I had my gun, my

Finerty - Direct

badge on my waist, and --

Q. The agency you were supervising from Homeland Security and the other agencies that you mentioned, were they similarly dressed that day.

A. Yes.

Q. They all displayed markings on their vest or other regalia that indicated that they were members of the law enforcement, either state police and/or federal agencies?

A. Yes.

Q. What kind of markings did they have?

A. They have their vest, their tactical vest, their bulletproof vest, and it says the words "Police" or "U.S. Border Patrol," "Homeland Security Investigations, Enforcement/Removal Officers," or it will say "Police."

Q. Okay. Were most of the agents or the police officers or the agent -- people who were engaged in crowd control wearing body-worn cameras that day?

A. The Border Patrol agents. Our agency does not have body-worn cameras, so Homeland Security Investigations did not have that. I don't believe F.B.I. or ATF does either, or DEA. But certainly the Border Patrol agents do.

Q. Okay. And directing your attention to about the period from 9 to 10 p.m., where were you?

A. Between 9 and 10 a.m.?

Q. A.m. I'm sorry.

Finerty - Direct

A.   I was stationed at the -- on the parking lot area/street from Harvard Street and 25th Avenue.

Q.   Can you give us a brief description of that locale?

A.   Yes.  That is the entry and exit way off of 25th Avenue. It's -- Harvard Street is like a parking lot that leads directly to the Broadview Staging -- Service Staging Area. That's the entryway.

Q.   Harvard Street is a city thoroughfare --

A.   Yes.

Q.   -- in Chicago.

     City thoroughfare?

A.   Yes.

Q.   So then it's a public way people can come and go on the street, right?

A.   Yes.

Q.   Were there gates that protected the Broadview facility from entry by the general public?

A.   Yes.  Off of Beach Street there are gates, off of Beach Street.

Q.   And were there tactical units, in other words, vehicles, that were coming and going from the facility that morning?

A.   Yes, there were.

Q.   And was it necessary to keep the street clear for the vehicles to ingress and egress, that is, come and go?

A.   Yes, it was.

Finerty - Direct

Q.    And how were the agents that morning facilitating keeping the streets clear?

A.    They were giving commands, verbal commands to the crowd, to individuals there to protest that day to stay back, to stay off of that thoroughfare, to stay off of the street so that we could keep a safe environment and nobody would get hurt as the vehicles were going in and out of the --

Q.    And was there a crowd there that morning?

A.    Yes, there was.

Q.    And can you tell us, in your personal estimation, about how many people?

A.    I would say 100 to maybe even 150, 200.

Q.    And from the period that I already referred to, from 9 a.m. to 10 a.m., what were they doing?

A.    They were protesting.  They were standing off of that street, Harvard and 25th Avenue.  They had signs.  Certainly exercising their right against the immigration policies of our agency.

Q.    And were efforts made by the officers under your supervision and other officers from the other agencies that you indicated, efforts made to keep the protesters out of the way of the vehicles that were coming and going?

A.    Yes.

Q.    And what kind of efforts were those?

A.    Our main purpose was to give them verbal commands.  They

11

Finerty - Direct

were told multiple times to move back so that we could keep that street safe and secure, to move those vehicles inside and out. And if they weren't following verbal commands, then the agents or officers would be using physical force to physically move them --

Q. What --

A. -- to a safe location.

Q. -- kind of use of force?

A. There was, I would say, pushing, nudging certainly; pointing, nudging, pushing.

Q. And they were giving them verbal commands, as well?

A. Yes.

Q. And did those verbal commands include warnings that if they did not comply with the orders to move out of the way of the vehicles that were going to be coming and going that they were subject to arrest?

A. Yes.

Q. And can you give us an example of some of the commands that were used in that capacity?

A. Yes.

There -- Chief Bovino, who was the chief Border Patrol agent for that day, that operation, he was told -- he told the entire crowd at one point that there was going to be one verbal command, that you were going to be warned one time to move back, and that after that command you would be placed under

Finerty - Direct

arrest if you didn't follow that command. And then throughout that time, agents and officers were giving commands to move back, move back, over and over and over again.

Q. Okay. And were the agents and officers lined up sort of shoulder to shoulder in lines so that they would be able to move people --

A. Yes.

Q. -- in a uniform fashion back out of the street so that vehicles could come and go?

A. Yes.

Q. Okay. Did they have any kind of batons or shields or other implements that they were able to use to push people back?

A. Some officers, yes, have batons. I didn't see them out in the video footage that I looked at particularly. I think people were using their hands mainly.

Q. Okay.

A. But, yes, they had batons.

Q. And have you reviewed various footage that was taken that day, not only by body-worn cameras of the agents, but by other people in the crowd who posted things on YouTube?

A. Yes.

Q. What, for example, have you reviewed?

A. I had seen one video taken by I believe a streamer/podcaster. His name is known as BG On The Scene. And it was a video with Mr. Sheridan in the video showing an

Finerty - Direct

encounter with him with Illinois State Police.

And then I also reviewed body-worn camera footage that also showed, you know, several arrests that occurred with Border Patrol Agent Jason Epperson, and one of them being his encounter with Cole Sheridan.

Q.    Who is Jay Epperson?

A.    He is a Border Patrol agent.  He was temporarily assigned here in Chicago.  He is stationed in Erie, Pennsylvania, and he was here as part of the operation that we blitzed.

Q.    And did you also see -- is it Commander Bovino?

A.    Chief Bovino, yes, I did.

Q.    And did you see him in a location adjacent to or very close to Agent Epperson?

A.    Yes.

MR. HOGAN:    So, your Honor, at this point I would like to play a short -- I believe it is a minute-and-20-second-long YouTube clip that Special Agent Finerty just referred to.  It was taken by a YouTuber, I believe, and posted on YouTube.  If I could ask the Court to switch over.  This has been provided to defense counsel.

THE COURT:    Before you do that, can I just clarify one piece of information?

MR. HOGAN:    Of course.

THE COURT:    You just referred to Jason Epperson.  Is he Agent A in the affidavit?

Finerty - Direct

MR. HOGAN:    He is.

THE WITNESS:    Yes.

MR. HOGAN:    Agent A, yes.

THE COURT:    And Chief Bovino is Agent B in the affidavit?

MR. HOGAN:    That is correct.

THE COURT:    Mr. Horwitz, do you have any objection to the publication of this video?

MR. HORWITZ:    I would just ask what the relevance is. My understanding is that the video the government seeks to play is maybe an hour prior to the incident charged.

MR. HOGAN:    The relevance is that, in that period of time, from approximately 9 to 10 a.m., the incident we are referring to took place around 9:45.  The video that I am asking to play is some time shortly before that, and it shows the defendant in the street engaged with police officers, mostly Illinois State Police officers, who are giving him repeated directions to get out of the street and to clear the area, and he is continually resisting it, resisting those, and having to be forced out of the area by Illinois State Police officers because he is not complying with their legal directions to move.  It shows that the defendant that day -- the incident that occurred later on with Chief Bovino was not an isolated incident on the part of the conduct that he engaged in that morning for quite a period of time, repeatedly ignoring

Finerty - Direct

repeated orders to act lawfully and get out of the street.

MR. HORWITZ: Judge, what I am hearing is that there were orders given by state law enforcement to Mr. Sheridan at a different time. That doesn't appear to be adjacent or immediately preceding the event in question here.

MR. HOGAN: To the contrary, it does. It is immediately preceding and immediately on the scene.

THE COURT: What do you mean by "immediately"? Like what's the time frame?

MR. HOGAN: It is within a half an hour. I don't know exact time. I'm not sure that there is a time stamp on the YouTube. I can ask Special Agent Finerty if she knows any more than I do.

THE COURT: With respect -- with respect to -- this is a question for Mr. Hogan, so I don't want this to come across as I am asking the witness testifying. But there is a reference in the search warrant affidavit that -- that there had been, I thought, an earlier observation of Sheridan, but it was unclear to me if that is Agent B who observed Mr. Sheridan earlier.

MR. HOGAN: That is correct. There is a reference in there. I believe it is in paragraph 12 on page 4. "Border Patrol Agent B stated he recalled Sheridan as a protester around 9:30, 10 a.m. to whom he provided verbal commands several times to move back as he was attempting to clear the

Finerty - Direct

entry and exit way into Harvard Street and South 25th Avenue leading to the BSSA."

That is depicted in the video that I am asking to play; not the orders by Chief Bovino, but that same time period, and Mr. Sheridan being directed by other agents and by, particularly, Illinois state troopers to move and then being forcibly removed by Illinois State Police to the side area, where he then subsequently, shortly thereafter, encountered Agent Bovino again and led to the incident that led to his arrest.

THE COURT:   What is the time of this video?

MR. HOGAN:   Again, it is that same period of time.  It doesn't have a time stamp on it.  I believe I can ask Agent Finerty if she can tell, from having been present, when it was with regard to the period in which Mr. Sheridan was arrested.

THE COURT:   Could you provide a little bit more foundation just as far as the time frame --

MR. HOGAN:   Sure.

THE COURT:   -- that this -- if the witness can answer it, the time frame depicted in this video.

BY MR. HOGAN:

Q.   Agent Finerty, you have had a chance to look at the YouTube video that I have described, correct?

A.   Yes, I have.

Finerty - Direct

Q.    In fact, how did we come about -- how did you come across this video?

A.    We were trying to locate videos from earlier that day to get more of an idea of what exactly occurred prior to and during that event, so we were just trying to look on social media and any other -- we have criminal analysts that had located it.

Q.    And you were able -- someone working with or for you located this video.

A.    Yes.

Q.    And can you describe what it depicts and the timing as best you can recall with regard to how it relates to the timing that -- of the incident that led to Mr. Sheridan's arrest?

A.    Yes. I don't have an exact time of when that video was taken, but I do know it is before and it is the morning of. So we started moving the line at about 9:15, 9:20. I know because I was there.

Q.    And this video depicts people and what you just described as moving the line?

A.    Yes. Well, we were -- we moved the line at that time. This video was taken definitely before that time because Illinois State Police was already positioned prior to us moving the line, prior to the rest of the federal agencies joining in and then moving the line.

Q.    Can you give us your best estimate as to how soon this

Finerty - Direct

video was taken before, that is, the depiction of the Illinois State Police moving the protesters out of the way before federal agents then subsequently also moved them out of the way?

A.    I would say anywhere between 7 and 9 a.m. that video was taken. It is dark out. The sun is not up specifically. It is light, but it is not -- the sun isn't shining like it is in the video that Border Patrol Epperson provided with his body-worn camera. So it is earlier than that event.

Q.    But you were out there that whole time.

A.    Yes, I was.

Q.    And you witnessed -- you witnessed the Illinois State Police doing what is depicted in this video?

A.    Yes.

Q.    All right.

And to your best recollection, it is somewhere a couple hours before at the most --

A.    I didn't see that particular instance with Mr. Sheridan and Illinois State Police, but I was there on scene --

Q.    And --

A.    -- that day, that morning.

Q.    -- clearly visible in the one-minute-and-20-second video that we were attempting to show right now?

A.    In this video, yes, he is visible.

THE COURT:   Anything else you want to ask,

Finerty - Direct

Mr. Horwitz?

MR. HORWITZ: We have gone now to maybe a half hour before or two hours before or a different time of day. The sun is not quite full daylight. I am just objecting to the relevance. I think it is a waste of the Court's time because it doesn't show anything related to the question before the Court.

MR. HOGAN: It shows exactly what is later depicted in the video with Agent Bovino in that Mr. Sheridan was continually that morning engaged in refusing to obey lawful commands by law enforcement and engaged in a pushing and shoving match with multiple members of law enforcement, not just the Border Patrol agent who is engaged in his arrest, but Illinois State Police beforehand, as well. It shows him recalcitrant. It shows him argumentative. It shows him in violation of lawful orders to clear.

THE COURT: Okay. Could I just ask, then, a direct question? Mr. Hogan, is the conduct that is depicted in this video -- the charge relates to Mr. Sheridan's interaction with Chief Bovino.

MR. HOGAN: Yes.

THE COURT: So Chief Bovino is not in this -- is not engaging or interacting with Mr. Sheridan in this video, correct?

MR. HOGAN: No, that's true. It just shows

Finerty - Direct

Mr. Sheridan engaging in the same kind of conduct he did with Special Agent -- or with Chief Bovino with others, and the video with Chief Bovino -- first of all, Chief Bovino is not wearing a body-worn camera. Second of all, the actual interplay, that hand-grappling between Chief Bovino and Mr. Sheridan, is not captured, as reflected in the affidavit. And I think the Court is very aware that video was taken by body-worn camera of Special Agent Epperson and it is not directly focused on the interaction between Chief Bovino and Mr. Sheridan. So the manner in which they grabbed each other and fell to the ground is not depicted. However, the similar conduct by Mr. Sheridan is depicted in this earlier video with additional law enforcement agents.

THE COURT: Again, that is not the conduct charged here, right?

MR. HOGAN: No, but it certainly informs this agent's testimony and the statements in the affidavit of the manner in which Mr. Sheridan behaved that morning. The description by Special Agent Epperson about what happened is matching what is depicted in this video, and it goes to refute the opening statement by defense counsel that there is nothing shown in the video in this case and there is no probable cause. Mr. Sheridan was continually engaged in problematic and illegal conduct that morning, and this goes to prove that.

THE COURT: All right. Again, I will allow the

government to publish this exhibit.  I have noted the objections, Mr. Horwitz; and, in my ruling, I will make clear what relevance, if any, I will give or weight I will give this video.  But the government bears the burden here and Federal Rules of Evidence don't really apply to -- or don't apply here. I understand the points made; and, again, I will articulate what, if any, weight I am going to give this video in my ruling.  But I do think that the government has established a basis for playing it, and so you can go ahead and publish it, Mr. Hogan.

MR. HOGAN:    Thank you, your Honor.

BY MR. HOGAN:

Q.    Now, Special Agent Finerty, there is an image on the screen.  I am going to try and blow it up for the whole screen. This is a YouTube video, correct?

A.    Yes.

Q.    And at the bottom on the left it says "BG" on the screen. Do you know what that refers to?

A.    I believe it is the individual's moniker that posted the YouTube video.

Q.    Okay.  Then there is a caption on the bottom, "State Police push protesters back outside ICE facility in Broadview, Illinois."  Do you know who put that caption on the bottom of the video?

A.    I believe the @BGOnTheScene.

Finerty - Direct

Q.    And you have already described how your analysts made a search for additional potential evidentiary materials, including videos.  Is that how this particular video was discovered?

A.    Yes.

Q.    All right.  And for purposes of the record, I am going to identify this as YouTube video of 10/3/25.  Okay?

A.    Yes, yes.

Q.    I am going to point with my cursor in the middle to the right of the screen and I am drawing a circle around a person depicted there in a white bicycle helmet with a white -- with a respirator that is black and white.  You can see the individual's hair appears red.

          Do you know who that person is?

A.    Yes.

Q.    Who is that?

A.    Mr. Sheridan.

Q.    And can you tell me who the people in the front line are that I am -- that I am pointing to with my cursor now?

A.    Illinois State Police.

Q.    And the Illinois State Police, this individual, for example, with the number 6112 on his helmet, he is holding a baton in his hands?

A.    Yes.

Q.    As are several other police officers, Illinois State Police

Finerty - Direct

officers.  For example, the one that I am pointing to right now, right in the middle of the video, he seems to be also holding a baton?

A.   Yes.

Q.   What was the purpose of the -- what were they used for, the batons?

A.   To keep the crowd back.

Q.   Okay.  Did you see any of the officers or any of the state troopers strike anybody with batons?

A.   I did not.

Q.   They were just used to push back for crowd control.

A.   Yes.

Q.   And there are a number of people behind the state troopers in the line holding up cameras, for example, the person in the middle of individual 83, the screenshot that I am pointing to right now, correct?

A.   Yes.

Q.   And then another person here to the right, also wearing a white helmet who also appears to be holding a camera is an officer, right?

A.   Yes.

Q.   And then a number of people in line back behind the people with the cameras, including Mr. Sheridan, right?

A.   Yes.

Q.   Now, from your familiarity with the scene, can you tell us

Finerty - Direct

where in the vicinity of the Broadview Border Patrol facility this depicts?

A.   Yes.  Again, this is Harvard, Harvard Street, and right off of 25th Avenue.

Q.   And is that the entrance to the facility?

A.   Yeah.  If you continue down Harvard Street, that will take you to the BSSA, yes.

Q.   And, now, this shows that -- the video is queued up to 0.00 and then it lasts until 1.19.  That is a minute and 19 seconds, right?

A.   Yes.

Q.   And before I play it——and I am going to play it mostly straight through——can you give us a general, just, description of what we are about to see?

A.   Yes.  It is the events of the day.  There are individuals protesting off of Harvard and 25th Avenue in Broadview, Illinois, which is the area close to our ICE detention facility known as the BSSA, and Illinois State Police, it will be their first encounter of law enforcement.  They were the first line of law enforcement that an individual would encounter, and then behind them we would be coming up after that.

Q.   Okay.  And what are the Illinois State Police attempting to do in the video that we are about to see?

A.   They are attempting to control the crowd and get them into a safe area and then out of the roadway so that the vehicles

Finerty - Direct

could come in and out of the entrance from Harvard into the BSSA.

Q.   And were they giving the crowd lawful orders to disburse from the roadway?

A.   Yes, they were.

Q.   And did the crowd obey?

A.   Yes, they did.  Some of them.  Some of them did not.  I see a couple of other individuals in the video that I recognize.

Q.   Okay.  And was Mr. Sheridan among the crowd that was ordered out of the roadway?

A.   Yes.

Q.   And did he obey?

A.   In this video, it appears that they had to physically move him.

Q.   We are about to see that, correct?

A.   Yes.

MR. HOGAN:   Okay.  Your Honor, I am playing the video now, and I already indicated it is queued up to 0.00, and I may stop it.  If I do, I will indicate where with regard to the time.

(Video played)

MR. HOGAN:   All right, now I have stopped it at 17 seconds.

Q.   Is the portion that I am indicating with the cursor now, is that Mr. Sheridan now in the left middle sort of towards the

Finerty - Direct

rear of the video?

A.    Yes.

Q.    And the state troopers at the bottom here in the front are using hand gestures and their batons to push people out of the roadway, is that right?

A.    Yes.

            (Video played)

            MR. HOGAN:    Now, I have stopped it again at 35 seconds.

Q.    You see the person in the white helmet in the respirator with the white piece in the front?

A.    Yes.

Q.    Depicted right behind the gentleman holding up the camera in the far left of the video?

A.    Yes.

Q.    Is that Mr. Sheridan?

A.    Yes.

Q.    Is he crowding towards the back of the state troopers who are moving the crowd off the roadway?

A.    Yes, he and other individuals are seen behind the Illinois State Police.

            MR. HOGAN:    I am going to renew playing the video now at the 35-second mark.

            (Video played)

            MR. HOGAN:    Now, I am stopping it at the 45-second

Finerty - Direct

mark.

Q.   Do you see Mr. Sheridan come into the frame again from outside of the frame, once again depicted behind the gentleman holding the camera up as he is approaching some of the state troopers now?

A.   Yes.

Q.   And did it appear that he was being pushed from behind?

A.   Yes.

MR. HOGAN:   I am going to play again starting at the 45-second mark.

(Video played)

MR. HOGAN:   Now I have stopped it at the 46-second mark.

Q.   Do you see Mr. Sheridan now right in the middle of the frame --

A.   Yes.

Q.   -- being shoved from behind by a law enforcement officer?

A.   Yes.

Q.   Can you tell what department or agency that law enforcement officer works for?

A.   I am not positive, but I believe it is Cook County.

Q.   Okay.

MR. HOGAN:   And again resuming the video at the 46-second mark.  I hope.  Okay.  All right.  I will rewind it to 45 seconds.

Finerty - Direct

(Video played)

BY MR. HOGAN:

Q.    Okay.  Now Mr. Sheridan is being, at the 46-second mark, pushed towards the Illinois state troopers, behind the state troopers, right?

A.    Yes.

(Pause)

THE COURT:    Mr. Hogan, is this a wifi issue?

MR. HOGAN:    It is, I believe.

(Video played)

(Pause)

MR. HOGAN:    It is, your Honor.  I think we are just at the mercy of the --

THE COURT:    What are you using for wifi?  Are you using a hot spot?

MR. HOGAN:    I am just using my computer.  I think it is hooked up to . . .

THE COURT:    Do you have this downloaded on a thumb drive?

MR. HOGAN:    No.

THE COURT:    Okay.  I have an 11:30 detention hearing that is going to take about 30 to 45 minutes.

MR. HOGAN:    Right.  I can move through this, then, more quickly.

THE COURT:    Well, I -- you started playing the video.

Finerty - Direct

I want to see the whole video then, and there is another video, correct?

MR. HOGAN: Yes, there is.

THE COURT: Okay. What I am going to ask you to do, and I am sorry to impose this additional time on the attorneys and this -- the defendant, as well as this witness, but I think, in this 45-minute break, what might make sense is to download these videos on to a thumb drive.

MR. HOGAN: Sure.

THE COURT: And then we can even use -- we can plug -- well, we will figure it out. But I think the issue is if you are just streaming them, there is going to be this continued issue.

MR. HOGAN: Right.

THE COURT: And I envision Mr. Horwitz wanting to utilize the videos on the cross-exam, as well.

MR. HORWITZ: Correct. And just if it helps, I have the other video on a thumb drive, so we are good with --

THE COURT: Okay. So we just need one video on a thumb drive, then, and you think you can accomplish that, Mr. Hogan --

MR. HOGAN: Yes.

THE COURT: -- during this break.

But I will proceed with my detention hearing and then I would ask everyone to come back here. And this is also

assuming that the defendant who is in custody is in my courtroom by 11:30. Let's just say reconvene here, please, at 12:15.

MR. HOGAN: Very well.

THE COURT: Okay. Thank you everybody. We are adjourned.

The witness is still under oath. I just want to remind you of that. You are still on direct, as well, so you shouldn't engage with Mr. Hogan about the substance of your testimony.

Thank you.

(Recess)

THE CLERK: This court is back in session. Recalling case 25 Cr. 634, U.S.A. v. Sheridan, preliminary examination.

MR. HOGAN: Good afternoon, your Honor. William Hogan on behalf of the United States.

MR. HORWITZ: Good afternoon, Judge. Ben Horwitz, on behalf of Mr. Sheridan, who is sitting to my left.

THE COURT: Thank you.

So we are back after a break to accommodate a detention hearing that I had to deal with and also we were having some technical difficulties with the video which I am hoping have now been resolved.

So Supervisory Special Agent Finerty is still on the stand, and I will just remind our witness that you are still

Finerty - Direct

under oath.

And with that, Mr. Hogan, you may proceed.

MR. HOGAN:   Thank you, your Honor.

BY MR. HOGAN:

Q.   Now, Special Agent Finerty, before we broke, we were watching the video that was taken by the YouTuber that I referred to, I think, as YouTube Video 10/3/25, and I think we were at about the 45-second mark.

I am going to replay the video because we have already seen, now, Mr. Sheridan in the middle of the video sort of being pushed from behind, and I want to play it all the way through from the 16-second mark, and I believe the entire video goes to about 1 minute and 19 seconds.

So I am going to play the remainder of the video starting now, with the Court's permission.

THE COURT:   You may proceed.  Thank you.

MR. HOGAN:   Thank you.

(Video played)

MR. HOGAN:   Now I am going to stop the video at the 55-second mark.

Q.   Can you describe for the record what we have just witnessed in the approximately, whatever, 25 seconds that we have just watched?

A.   Yes.  Mr. Sheridan appears to my left side of the screen and it looks like Cook County Police, law enforcement officers,

Finerty - Direct

have grabbed him and then are pushing him towards the rest of the individuals, you know, away from law enforcement, and it looks like Mr. Sheridan is kind of pushing back with his back.

MR. HORWITZ:   Objection: speculation, foundation.

MR. HOGAN:   Well, maybe we should play it, then, again.

(Video played)

BY MR. HOGAN:

Q.   That is Mr. Sheridan coming into sight at the 45-second mark, which is where we stopped before we broke, correct?

A.   Yes.

Q.   And now for the next ten seconds he is going to be shoved from behind.

THE COURT:   Mr. Hogan, you are providing your interpretation now of the video.  You can just play it, and then you can ask factual questions of the witness, please.

MR. HOGAN:   Okay.  Let's play the next ten seconds.

(Video played)

MR. HOGAN:   All right.  I am stopping at the 50 second mark.

Q.   What did we just see in the last five seconds?

A.   It looks to me that Mr. Sheridan is planting his feet and pushing back on the law enforcement officers that push him then into the rest of the crowd.

Q.   And how many law enforcement officers did it take to push

him --

A. It looks like --

Q. -- (indiscernible).

A. Excuse me. It looks like three to me.

Q. Okay. Thereafter, was the demonstration ongoing for a period of time until approximately the period that we are concerned with here around 9:30?

A. Yes.

THE COURT: Mr. Hogan, are you done with the video?

MR. HOGAN: I am.

THE COURT: Okay. We will just turn the screen off. Thank you.

(Video played)

MR. HOGAN: I am just cuing up the next video, your Honor.

THE COURT: Okay.

BY MR. HOGAN:

Q. Directing your attention to approximately 9:30, what was going on at that time?

A. Again, we were trying to move the crowd back into a safe and secure environment, out of the street, out of the area, away from any of the law enforcement vehicles that were entering and exiting off of Harvard in order to get to the BSSA.

Q. And you indicated that one of the agents that day that you

Finerty - Direct

were supervising was Agent Epperson from Erie, Pennsylvania?

A.    I was not supervising him.  I was supervising Will Racke, who assisted with the arrest.

Q.    But Special Agent Epperson was present on the scene?

A.    Yes, he was.

Q.    And you subsequently had a chance to interview him about an incident that took place regarding Mr. Sheridan, right?

A.    Yes.

Q.    And then you prepared an affidavit based on probable cause to secure a complaint against Mr. Sheridan, did you not?

A.    Yes.

Q.    Later that day, on October 3?

A.    Yes.

Q.    And in that affidavit, which I am just going to refer to as criminal complaint affidavit in case 25 Cr. 634, you swore that the facts that you had gleaned and gathered were true and accurate, correct?

A.    Yes.

Q.    And you interviewed persons indicated in the affidavit as Border Patrol Agent A and Agent B, right?

A.    Yes.

Q.    And to whom do those designations refer?

A.    Border Patrol Agent A is Jason Epperson and Border Patrol Agent B is Chief Gregory Bovino.

Q.    And in the affidavit, you refer on page -- paragraph 6 --

Finerty - Direct

would you refer to the affidavit? Do you have a copy of the affidavit?

A. Yes, I do.

Q. Could you refer to it, please?

And would you tell us what the affidavit reflects in paragraph 6.

A. Do you want me to read that to you or --

Q. Just --

A. Okay.

Q. What did you --

A. I --

Q. What did you glean from talking to Agent Epperson that's reflected in your affidavit?

A. Yes, that -- that various arrests were made on October 3, when I spoke with him and also reviewed that body-worn camera footage; and that, at approximately 9:23, Border Patrol agents encountered Sheridan in a grassy area near the BSSA parking lot from Harvard Street and 25th Avenue, in Broadview, and I observed the officers in contact with Sheridan that wore vests that were clearly marked with "Police" and "U.S. Border Patrol."

Q. And did you --

MR. HORWITZ: Judge, I would just ask that the record reflect that the witness has just read paragraph 6 from the complaint.

Finerty - Direct

MR. HOGAN:    That's fine.

THE COURT:    Yes.  That is reflected.

And, Mr. Hogan, I think you are trying to establish right now a foundation for the video, and I don't know that she even needs to be reading from the affidavit --

MR. HOGAN:    Okay.

THE COURT:    -- so --

BY MR. HOGAN:

Q.    Did you have an opportunity to review the body-worn camera video that Agent Epperson had that morning.

A.    Yes.

Q.    And is that what is --

MR. HOGAN:    If we could display that on the screen, please, your Honor?

THE COURT:    Yes.  Peggy, could you publish again, please?  Thank you.

BY MR. HOGAN:

Q.    Is that what is displayed on the screen now?

A.    Yes.

Q.    And I am just going to refer to this as acts on body 4, numeral 4, video.

Is that a true and accurate copy of the video that was taken by the body-worn camera of Agent Epperson that morning?

A.    Yes.

Q.    And how long is the entire video?  Do you know?

Finerty - Direct

A.    I do not know offhand.

Q.    Okay.  Well, queue the video up at the 15:26 mark.

Is the ensuing minute or so the portion that we are concerned with here in court today?

A.    Yes.

Q.    And can you just tell us what we are about to witness?

A.    Yes.  In Border Patrol Agent Epperson's camera, you will see footage of his encounter.  Initially there is an Illinois State Police officer ahead of Border Patrol Agent Epperson, an encounter shared in, and then moves to the side.  And then you will see Border Patrol Agent Epperson engage Sheridan and tell him to move back several times and then also nudge him and push him.  And then you will also see Chief Gregory Bovino in the view of the body-worn camera footage of Agent Epperson, and you will see that -- you will see him tell Mr. Sheridan to move back.  And then he says, "Move back or you are under arrest," and then, again, proceeds to engage the other individuals next to Mr. Sheridan.  And then we will see Mr. Sheridan go down.

MR. HOGAN:    Okay.  I am going to play that portion of the video beginning at 15:27.

MR. HORWITZ:    If I could just jump in here, Judge.  I don't have an objection here.  I do just want to raise to the Court, as a matter of completeness, I am going to be asking him to play the video from 0:00 through here, so I am happy to kind of do that in reverse order up until the point that the

Finerty - Direct

government is doing it now. But to the extent the Court wants it sequentially, I just wanted to raise that for the Court.

THE COURT: Yes. I appreciate that Mr. Horwitz.

And I would actually rather see it from start to finish, Mr. Hogan, because piecemeal is I think less efficient, and also I would benefit from seeing it from start to finish.

MR. HORWITZ: And when we are saying start to finish, as far as the relevant portions for the Court's consideration, I don't think it is the full 50 minutes. I would say the relevant portion is probably no more than 20.

THE COURT: Could we just make sure the record is clear as far as start and stop time? We can go off the record for a minute if you all want to talk about those times. But I just want the record clear about as far as what we are going to publish. Do you want to talk for a minute?

MR. HORWITZ: Sure.

THE COURT: Okay. We are off the record for a minute.

(Discussion off the record)

MR. HOGAN: I am about to start the video.

THE COURT: Wait. Are we on the record?

THE CLERK: We are, Judge.

THE COURT: Okay. So we just had an off-the-record exchange and, for efficiency, which is the goal here, we are going to play the video with the agreement of counsel for both

Finerty - Direct

sides from zero to about 1:79. Is that --

MR. HORWITZ: Yes.

THE COURT: Mr. Hogan, you are in agreement with that, as well?

MR. HOGAN: Yes.

THE COURT: So we are going to start it at zero.

MR. HOGAN: Right. I am going to start it right now, your Honor.

(Video played)

MR. HOGAN: I am stopping the video at 16:03.

Q. Is that Mr. Sheridan standing there with his arms crossed?

A. Yes.

(Video played)

Q. Who is that who just walked up to Mr. Sheridan directing him to move back?

A. That is Chief Gregory Bovino.

Q. And he is referred to as Border Patrol Agent B in your affidavit?

A. Yes.

Q. He was in charge that day.

A. Yes.

(Video played).

Q. Who is it that -- whose hand is that depicted in the screen now that was just pushing Mr. Sheridan back?

A. That is Border Patrol Agent Jason Epperson.

Finerty - Direct

Q. And the other hand that is on Mr. Sheridan's chest right now?

A. That is his hand as well.

(Video played)

Q. Now, what's happening in the left-hand side of the screen right now?

A. That is when Sheridan is being placed under arrest. That is when he is being restrained.

Q. And that is at the 16:41 mark?

A. Yes.

Q. And do you know who is depicted in this portion of the video that I am showing with my cursor right now on the left-hand side of the screen that's bent over --

A. I do not.

Q. -- and you see his back?

Pardon me?

A. I do not.

(Video played)

MR. HORWITZ: Judge, we are at -- past the 17. I have no objection to going further, but I defer to the government and the Court in terms of time.

THE COURT: Mr. Hogan, do you want to continue to play or do you want to stop it?

MR. HOGAN: I'm sorry?

THE COURT: Mr. Horwitz has no objection to continuing

Finerty - Direct

to play it, but I think we are past the point that you had wanted to publish, but you are free to keep going.

MR. HOGAN:    I am just going to go a little bit further, your Honor, to make sure that I have captured the entirety of what I want to play.

(Video played)

MR. HOGAN:    Okay I am stopping it at the 17:44 mark.

BY MR. HOGAN:

Q.    So from about 16:02 until about 16:30, what did we see, Agent Finerty?

A.    We see Sheridan initially being encountered by Illinois State Police.  There is somebody in front of Border Patrol Agent Epperson's camera, and then he moves out of the way and Agent Epperson engages Sheridan and tells him to move back.  He gives him verbal commands to move back several times and nudges his elbow.  I believe he also nudges his shoulder and tells him to move back, and then engages another individual next to Sheridan.

Q.    And did you interview Agent Epperson about what he saw as he was doing that with regard to Mr. Sheridan?

A.    He stated that he gave verbal commands to Mr. Sheridan to move back several times and that Mr. Sheridan was not obeying verbal commands to do so, and then he attempted to physically move him using his hands and then he proceeded to continue to move him back and then engaged -- and then saw in his

Finerty - Direct

peripheral that -- well, he saw Gregory Bovino, Chief Bovino

deal with Mr. Sheridan.

Q.    And what did he describe Agent Bovino doing?

A.    He -- again, Chief Bovino gave Mr. Sheridan verbal commands to move back and also used his hands to try to physically move him back and that Sheridan continued to resist and not follow verbal commands.  And then he stated that, in his peripheral, he saw what he thought was Mr. Sheridan taking a swing at Mr. Bovino, but that he also pushed Mr. Bovino.  When Mr. Bovino -- when Chief Bovino pushed Mr. Sheridan, Mr. Sheridan pushed him back and he saw that.

Q.    And did he see them fall to the ground?

A.    Yes.  He saw Chief Bovino fall forward, and then he saw them go down to the ground.

Q.    And did you then interview Chief Bovino, as well?

A.    Yes, I did.

Q.    What did he tell you?

A.    He stated that he recalled his encounter with Mr. Sheridan. He identified him as a tall white male with red hair.  And he stated that he had given Mr. Sheridan several verbal commands to move back and that he was resisting him and not obeying verbal commands, and that he proceeded to use his hands to physically move Mr. Sheridan back to a safe environment, and that Mr. Sheridan pushed him back, and that's when he restrained Mr. Sheridan and a team of about three agents

arrested Mr. Sheridan.

Q.  When you say restrained him, how did he do that?  What --

A.  To handcuff him, to attempt to handcuff him.

Q.  Was Mr. Sheridan standing or on the ground when that happened?

A.  He was initially standing and then taken to the ground.

Q.  And then he was placed under arrest by Mr. Bovino?

A.  Mr. Bovino and there were other -- there were at least two other agents with him.

Q.  Did you ask Agent Bovino whether or not Mr. Sheridan had actively swung at him?

A.  Yes, I did.

Q.  What did he say?

A.  He said he did not recall him swinging at him.

Q.  Okay.  Did he, Agent Bovino, go to the hospital after this encounter?

A.  Yes, he did.

Q.  And what happened then?

A.  I attempted to call him to interview him and he had told me -- his coworker's chief called me back and said that Mr. Bovino was about to go in for an MRI.  And I had asked what had happened, and he said, well, from events that day, and then also with his encounter with Sheridan.  And then he handed the phone to Chief Bovino, and Chief Bovino relayed the same, that he was suffering injuries due to his encounter with the arrests

Finerty - Direct

made that day, to include Mr. Sheridan.

Q.   And what kind of injury?

A.   He sustained a groin injury and he was given two weeks of bedrest.

Q.   And he is still on bedrest now.

A.   Yes.

MR. HOGAN:   May I have a moment, your Honor?

(Pause)

MR. HOGAN:   I have nothing further.

THE COURT:   Can I clarify something?  We don't have a court reporter here, so I don't have realtime, and I just want to make sure I heard the word correctly.  And maybe I can just ask this:  What did -- when the phone was handed to Chief Bovino, and you spoke with him from the hospital, could you just relay again what he said.

THE WITNESS:   Yes.

I said:  How are you doing, sir?

And he said:  I'm -- I'm -- I'm hurt.

And then I said:  Is everything okay?

He said:  No.  I mean, I'm hurt.  I'm going in for an MRI.

And then I said:  Okay, well, what happened?

And he said:  Well, all the arrests of that day, and then also he stated that specifically Sheridan, his encounter with Sheridan, led to his injuries from that day.

Finerty - Cross

THE COURT:   And he -- did he provide any other detail?

THE WITNESS:   No.

THE COURT:   But he words the word "arrests" plural?

THE WITNESS:   Yes.

THE COURT:   Okay.  You are done on direct, Mr. Hogan.

Okay.  Mr. Horwitz.

MR. HORWITZ:   Thank you.

CROSS-EXAMINATION

BY MR. HORWITZ:

Q.   Ms. Finerty, it sounds like you have spoken to three people about this case——Epperson, Bovino, and the person who answered the phone for Bovino at the hospital——is that correct?

A.   Yes.

Q.   Nobody else?

A.   I spoke to my coworker, Will Racke, who was part of the arrest.

Q.   How do you spell Racke?

A.   R-A-K -- C-K-E, R-A-C-K-E.

Q.   Was Will Racke wearing a body-worn camera?

A.   No.

Q.   Other than these four people, did you interview anybody else about this incident?

A.   No.

Q.   Did you review any documents regarding this incident?

A.   No.

Finerty - Cross

Q.   It sounds like you have reviewed two videos regarding this incident, which are the YouTube video that we watched and the body-worn from Epperson, is that correct?

A.   Yes.

Q.   You would agree no further videos.

A.   There are videos of that day.  I reviewed many videos of that day.

Q.   Let me be more clear.  You have reviewed no other videos of this incident, correct?

A.   No, that's correct.

Q.   And I guess I should clarify, because video one has nothing to do with this incident.

A.   Video one was taken on the same day, within an hour to two hours of the incident, so I believe it does have something to do with it.

Q.   Okay.  Well, while we are on that topic, you volunteered to the Court a different time of day, correct?

A.   I stated it was within potentially half hour to two hours, yes.

Q.   And you told the Court that the sun was not at the same height as during the incident with Chief Bovino, correct?

A.   Yes.

Q.   You did not recall from the first video that we watched any alleged assault, correct?

A.   Any assault to a law enforcement officer?

Finerty - Cross

Q.   Correct.

A.   That's correct.

Q.   Did you review any photographs regarding the incident with Mr. Sheridan?

A.   Photographs?  I don't believe so.

Q.   Other than the four people that you have mentioned speaking to, the two videos, have you reviewed any other materials as it relates to this case?

A.   No.

Q.   And your entire testimony is based on those six pieces -- six sources of information, correct?

A.   It is based on my interviews and the review of the videos, yes.

Q.   Which are four interviews and two videos, correct?

A.   Yes.

Q.   Now, just to be clear, and I think we have gotten this, but just for my edification, you have no personal knowledge about Mr. Sheridan's conduct as it relates to Chief Bovino or Agent Epperson, correct?

A.   That's correct.

Q.   You were not present.

A.   I was in the vicinity, but I did not witness the exchange, that's correct.

Q.   You could not see what was going on.

A.   That's correct.

Finerty - Cross

Q.   You could not hear what was said between the agents and Mr. Sheridan.

A.   That is correct.

Q.   Everything that you have learned about Mr. Sheridan's conduct on that date has come from at least secondhand sources, correct?

A.   From reviewing video footage and then also the interviews, yes.

Q.   Okay.  You would agree from the video that we have seen that the video does not show Mr. Sheridan assaulting a federal agent, correct?

A.   That's correct.

Q.   And so what you are telling this Court is that the evidence of Mr. Sheridan assaulting a federal agent comes just from word of mouth from the agents, correct?

A.   From word of mouth from the agents, yes, that I interviewed.

Q.   Okay.  Now, you work for HSI and, as the name of your department suggests, you have a long history in investigations, correct?

A.   Yes.

Q.   You stated that you worked for the government for over 20 years, correct?

A.   Yes.

Q.   And the majority of your work involves investigations.

Finerty - Cross

A. Yes.

Q. Investigations involves going out and speaking with people?

A. Yes.

Q. It involves doing your own research.

A. Yes.

Q. It involves reviewing all of the evidence that's available to you, correct?

A. All of the evidence that's available to me, that's correct.

Q. Okay. Now, the quality of the information available to you impacts your investigation, right?

A. I don't understand.

Q. Well, let's talk specifically about who you spoke with in this case. One of the people that you spoke with is Agent Bovino, correct?

A. Yes.

Q. And you are aware that Agent Bovino makes frequent television appearances.

A. I don't watch --

MR. HOGAN: Objection, your Honor. I don't understand the relevance of that.

THE COURT: Overruled.

Q. You are aware that he makes frequent television appearances.

A. I don't watch the news.

Q. You are aware that he publicizes a lot of CBP activity,

Finerty - Cross

correct?

MR. HOGAN:   Objection your Honor.  It's irrelevant to this incident.

THE COURT:   Overruled.

Q.   Are you aware of that?

A.   I never met him before that day.

Q.   Okay.  The video that we just watched --

A.   Yes.

Q.   -- at the beginning of CBP's march towards the protesters, do you recall that part of the video?

A.   Yes.

Q.   And you have had a chance to watch that video on your own, correct?

A.   Yes.

Q.   With full volume, correct?

A.   Yes.

Q.   At the beginning of that the audio on that video you can hear Chief Bovino say "Walk slowly," correct?

A.   I don't know who said that.  I did hear those words.  I don't know who said it.

Q.   Okay.  After the words "walk slowly," we see at least two individuals in reflective vests, correct?

A.   Yes.

Q.   And on the back of those vests, it is -- I think it is CBP PAO.  Do you recall that?

Finerty - Cross

A.   Yes.

Q.   PAO is Public Affairs Office?

A.   That is correct.

THE COURT:   Mr. Horwitz, just stay by a microphone when you turn.  And it's okay because you are trying to look at the witness.  But when you turn, you are getting out of the range.  Thank you.

MR. HORWITZ:   Thank you.

BY MR. HORWITZ:

Q.   It's the Public Affairs Office, right?

A.   That's correct.

Q.   And to your understanding, there was internal press to document CBP's conduct on that date?

A.   Yes.

Q.   And it appeared that that was a coordinated effort between the people taking the photos and video and the agents, correct?

A.   I don't know the circumstances of how that occurred.

Q.   Who was walking at the front of the group of agents approaching the protesters?  Would you agree that that was Agent Bovino?

A.   Yes.

Q.   Okay.

Now, as part of your investigation, you look into the sources that give you information, right?

A.   Yes.

Finerty - Cross

Q.    You are aware that Agent Bovino has received internal reprimands.

A.    I --

MR. HOGAN:    Objection.

A.    -- do not know that.

MR. HOGAN:    Objection, your Honor. What's that got to do with this?

THE COURT:    Well, the only source of the assault right now is what Mr. —— Agent -- is it Chief?

THE WITNESS:    Yes.

THE COURT:    -- Chief Bovino said, so I am going to allow some leeway here. Again, this a bench hearing before me.

You can continue.

MR. HORWITZ:    Thank you.

BY MR. HORWITZ:

Q.    You are aware that Chief Bovino has received internal reprimands.

A.    I am not aware of that.

Q.    You are not aware of that because you didn't look for that.

A.    I don't know that. I don't know that information.

Q.    As part of your investigation, did you look into the background of Chief Bovino?

A.    You mean from October 3 to today?

Q.    Correct.

A.    Did I look into Chief Bovino? No, I did not.

Finerty - Cross

Q.   Okay.  So you are also not aware of his contribution toward a trial in Los Angeles earlier this summer, correct?

MR. HOGAN:   Objection.

A.   I am not.

MR. HOGAN:   Your Honor, she just said she doesn't know anything about his background and it assumes facts not in evidence.

THE COURT:   Overruled.

BY MR. HORWITZ:

Q.   So you are not aware of the trial where Chief Bovino, among the federal CBP agents who testified, was the only one in a federal assault -- in an assault on a federal agent case, he was the only one that testified to physical contact.  You are not aware of that, correct?

A.   I am not, sir.

Q.   Okay.  You didn't look into that during your investigation, right?

A.   No, I did not.

Q.   You are not aware of allegations of Chief Bovino making false statements in the news, correct?

MR. HOGAN:   Objection.  There is no foundation for this whatsoever.  There is no way that he can possibly prove this up.

THE COURT:   Mr. Hogan, he is asking questions just about the scope of the investigation.  And, again, Chief Bovino

Finerty - Cross

is the only source of the key element for this probable cause hearing. I am going to give Mr. Horwitz some leeway here, Mr. Hogan. And I don't want to spend an hour on this, but I am assuming there are a couple more questions, Mr. Hogan, so your objection is overruled.

BY MR. HORWITZ:

Q. You are not aware of Chief Bovino making false statements in media, correct?

A. I am not.

MR. HOGAN: Your Honor, I am going to object. I would like to have a foundation for that and a good-faith basis for that question. I don't think he just gets to sit up here and skewer the guy's character just because he wants to ask questions.

THE COURT: Mr. Hogan, this is a probable cause hearing. We don't have a jury here.

And, Mr. Horwitz, you want to add some foundation for these questions?

MR. HORWITZ: Sure.

And, Judge, just to help the government and follow while I am at it, just give them an article.

THE COURT: Sure.

MR. HORWITZ: Thank you.

BY MR. HORWITZ:

Q. Ms. Finerty, just to be specific, you are not aware of a

Finerty - Cross

CalMatters article about Chief Bovino misleading the public, correct?

A.   No, sir.

Q.   You are not aware of the statement that he made justifying 77 arrests in which he told the public that they had criminal backgrounds in each of those 77 people.  You are not aware of that, correct?

A.   I am not.

Q.   And you are not aware of the subsequent finding that 76 of those people had no criminal record.  You are not aware of that either.

A.   I am not aware of any of these things that you are stating, no.

Q.   And because you are not aware of those, you were not able to take into account Chief Bovino's deceitful statement to the media --

MR. HOGAN:   Your Honor --

THE COURT:   -- of 76 --

MR. HOGAN:   -- I object to this.  If Mr. Horwitz had some evidence he wants to present to the Court, that's one thing.  But for him to ask questions of this agent who has already said repeatedly she doesn't know anything about these matters, with the implication that there is some factual basis to -- other than some hearsay newspaper article that doesn't even look like it's a news article.

Finerty - Cross

THE COURT:    This whole hearing is based on hearsay, Mr. Hogan.

MR. HOGAN:    I get that, but this is improper.

THE COURT:    Okay.  Mr. Hogan, that is for me to determine here.  I have given Mr. Horwitz some leeway.

Your point has been made, Mr. Horwitz.

MR. HORWITZ:    Understood.

THE COURT:    And I also think it's been made clear that the testifying agent has not done an investigation of Chief Bovino.  If you can just transition, unless there is something else on this topic, but, I mean, the point is made.

MR. HORWITZ:    One last point on this topic.

BY MR. HORWITZ:

Q.    As part of your investigation, you are not aware of statements made by the U.S. Attorney in the Northern District of California ordering Agent Bovino to follow court orders, correct?

A.    I am not aware of that.

Q.    You are not aware of those public statements, correct?

A.    I don't know anything about what you are talking about.

Q.    Okay.  And I assume that means that you are also not aware --

MR. HOGAN:    Objection.  If she doesn't know what he is talking about, then this follow-up question that presumes that she does is improper.

Finerty - Cross

THE COURT:   Sustained.  Do you want to rephrase it.

MR. HORWITZ:   Sure.

BY MR. HORWITZ:

Q.   Do you know that the U.S. Attorney from the Northern District of California has been fired?

A.   No.

Q.   Okay.

How many levels senior to you is Agent -- excuse me Chief Bovino?  Can you tell us?

A.   I don't know.  I work for Homeland Security Investigations. I don't work for Customs and Border Protection.

Q.   Okay.  Would you agree that Chief Bovino is senior to you?

A.   Yes.

Q.   Are you concerned at all that if your statements today contradict what Chief Bovino said how that would affect your career?

A.   I am not.  I have interviewed two individuals that saw or felt Mr. Sheridan push Chief Bovino.  That was two individuals. The Border Patrol Epperson -- Border Patrol Agent Epperson has no reason to lie, in my opinion, my personal opinion.  He stated that he witnessed the push, and I believe that is what he witnessed.

Q.   What is his position?

A.   On what?

Q.   Epperson, what's his professional position.

Finerty - Cross

A.    He is a Border Patrol agent.

Q.    Okay.

A.    Yes.

Q.    How far senior is Chief Bovino to him?

A.    I don't know their chain of command, unfortunately.  I don't work for them.  I work for Homeland Security Investigations.

Q.    Understood.

You can agree, though, that Chief Bovino, not only being senior to you, is also senior to Agent Epperson, correct?

A.    Yes, sure.

Q.    Okay.  Who is the head of your department?  Can you tell us that?

A.    The head?  Our secretary is Kristi Noem.

Q.    Is Kristi Noem in tactical gear at Broadview on October 3?

A.    She was present.  I don't know exactly what she was wearing.  I wasn't around her.

Q.    Was that her that we saw drive by in the tank in the video?

A.    I didn't see her.  I'm sorry.  I wasn't focusing on that. If you want to show me that portion, I am happy to look at it. I wasn't paying attention to her.

Q.    Okay.  When you were there, did you see a tank?

A.    Yes, I did.

Q.    And a tank drove down the street kind of away from the ICE facility, is that correct?

Finerty - Cross

A.   She wasn't -- to my knowledge she was not in that tank.

Q.   Okay.  Just taking a step back --

A.   Okay.

Q.   -- I just want to confirm that the tank in fact did drive down the street away from the ICE facility.

A.   Yes.

Q.   Is that correct?

A.   There was a SWAT team there that day, yes.

Q.   Can you tell us where the protesters were allowed to protest?  Can you define that area for us, please?

A.   They were allowed to protest -- just, basically, we were just trying to move them off so nobody would get hurt, off of Harvard and 25th Avenue.  And there is also private property there with businesses, and those businesses, unfortunately, have been closing their doors and had to excuse their employees because of the things that were going on.  So we were trying to move them off private property.  We were trying to move them out of the way of the vehicles, the government vehicles that were carrying individuals inside and out of the Broadview processing area.  So anywhere they weren't in immediate danger, where there was -- like I said, off of Harvard and 25th Avenue, we were trying to push people off that area so we could get the vehicles in and out safely and that nobody would get hurt.

Q.   So the short answer would be out of the street and off private property, correct?

Finerty - Cross

A.    Yes.

Q.    Anybody that's not on private property and not on the street is allowed to be there on October 3, is that correct?

A.    As long as they are not in the way of the vehicles and it is not a safety issue.  I don't know exactly what the lines were, if you are asking me where.  I just know that we were trying to keep the area safe and secure so we could move vehicles in and out.

Q.    And I am not even pointing the finger at you, but as a supervisor for HSI on the scene of the protests on October 3, it was not made clear to you exactly where the lines were, correct?

A.    My job was to handle any individuals that were placed under arrest.  That was my specific duty, was to interview those individuals and to also interview the individuals who placed them in custody.  That was my job that day.

Q.    Just bringing you back to my question --

A.    Sure.

Q.    -- the exact lines were not made clear to you, correct?

A.    To me specifically?

Q.    Yes.

A.    No, because that was not my job.

Q.    Understood.

In the video that you reviewed and relied upon in forming your opinion of probable cause in this case, you would

Finerty - Cross

agree that when Mr. Sheridan was engaged by Agent Epperson and Chief Bovino that his feet were on the grass, correct?

A.    Yes.

Q.    You would agree that feet on the grass means feet not in the street, correct?

A.    I don't know exactly where he was standing but, yes, I saw grass.

Q.    You saw grass under his feet.

A.    Yes.

Q.    Okay.  You mentioned a few minutes ago, or maybe when Mr. Hogan was speaking with you, that the point of clearing the crowd was to make way for government vehicles, correct?

A.    That's correct.

MR. HORWITZ:    Judge, I'm showing the government what I am marking for identification as Exhibit 1A and 1B.  May I approach?

THE COURT:    Yes.  Are you intending to publish these? Do you want me to see them?

MR. HORWITZ:    Yes.

THE COURT:    Do we have an Elmo in here?

THE CLERK:    Yes.

THE COURT:    And can we just hook that up?

MR. HOGAN:    I think it is.

(Pause)

BY MR. HORWITZ:

Finerty - Cross

Q.    Ms. Finerty, I am showing you what I am marking for identification as Defense Exhibit 1A.  Can you see that?

A.    Yes.

Q.    Do you recognize this?

A.    Yes.

Q.    What is it?

A.    It is the area off of Harvard Street near the Broadview Service Station.  That is the street -- Harvard is the main way to Broadview.

Q.    And you and I have had a chance to look at this before court today, right?

A.    When you showed it to me over here?

Q.    Yes.

A.    Yes.

Q.    And the text and logo in the top right tells us that this is from the body-worn camera file that you reviewed in your investigation, right?

A.    Yes, correct.

Q.    And the time code on this tells us that it is approximately within two minutes of the incident with Mr. Epperson, Mr. Bovino, and Mr. Sheridan, correct?

A.    Yes.

Q.    Okay.  And you would agree that this -- we are -- in Defense Exhibit 1A we are looking down the street into the ICE facility where Mr. Bovino's team walked out of, correct?

Finerty - Cross

A.    Yes.  We are all stationed in front of the Broadview Service Station, yes.

Q.    Showing you what I have marked for identification as Defense Exhibit 1B, you recognize this, too, right?

A.    Yes.

Q.    This is another screenshot of the body-worn file that you reviewed, correct?

A.    Yes.

Q.    This is -- they are both fair and accurate depictions of screenshots of the body-worn file that you (indiscernible), correct?

A.    Yes.

Q.    And this angle shows facing back the other way of 180 degrees turned from the previous screenshot, correct?

A.    I don't know the measurements, but I am -- I guess I will take your word for it.  I don't know the degree.  That's what you stated.

Q.    All I am saying is one way was facing one direction and, if you turned around, this depicted what faces in the other direction.

A.    Okay.

Q.    Is that correct?

A.    Yes.

Q.    And this depicts approximately what the crowd looked like in the moments leading up to the incident with Mr. Bovino,

Finerty - Cross

Mr. Epperson, and Mr. Sheridan?

A.    Yes.

Q.    Ms. Finerty, how old is Chief Bovino?

A.    I don't know.

Q.    You would agree he is not in his twenties.

A.    That's correct.

Q.    You would agree he is not in his thirties.

A.    Yes.

Q.    You would agree he is not in his forties.

A.    Yes.

Q.    Could he be 60?

A.    Could be.

Q.    Okay.

The injury that you learned of from the hospital was a groin injury, correct?

A.    Yes.

Q.    Nothing that you heard from Epperson, Bovino, or Racke indicated any kind of physical contact between Mr. Sheridan and the groin of Chief Bovino, correct?

A.    I know that he fell, so he fell forward, so I don't know if that was sustained.  I'm not a doctor, so I can't say to what -- how that happened.  I have never experienced a groin injury.

Q.    You can't say how common they are for men who are 60 years old going out into crowds, correct?

Finerty - Cross

A.    That's right; I can't say that.

Q.    It could have been sustained incidentally and apart from Mr. Sheridan, correct?

A.    I've never had a groin injury.  I am not a doctor.  I couldn't testify to that.  I'm sorry.

Q.    Right.  And as part of your investigation, you are unable to make any connection between the conduct of Mr. Sheridan and the groin injury of Chief Bovino, correct?

A.    All I can state is what they both told me, and he stated that he sustained the injury from events that day and also from his encounter with Mr. Sheridan.

MR. HORWITZ:    If I can just have a brief moment, Judge.

(Pause)

MR. HORWITZ:    Just a few more questions.

BY MR. HORWITZ:

Q.    From your testimony and the video that we saw, the police vehicles that were on scene on the morning of October 3 included police SUVs?

A.    Yes.

Q.    Other police vehicles.

A.    Yes.

Q.    A tank.

A.    Yes.

Q.    Okay.  At no point in the information that you reviewed did

Finerty - Cross

you hear any police loud speaker for the protest to disburse, correct?

A.   I heard Chief Bovino give a direction that:  We will be giving you one warning and then you are under arrest.

Q.   Right, and he said that multiple times, right?

A.   Yes.

Q.   Okay.  But to my question, no loud speaker, right?

A.   Not that I could hear.

Q.   No tear gas.

A.   No.

Q.   No water canon.

A.   No.

Q.   And after Mr. Sheridan's arrest, the protest continued, correct?

A.   Yes.

Q.   It was not cleared out.

A.   No.

Q.   Not every single person there was arrest.

A.   No, that's correct.

Q.   For all we know, it is going on right now, correct?

A.   It could be.

         MR. HORWITZ:   Okay.  If I could just ask the government to queue up the Video 1.

         THE COURT:   The YouTube video, just to clarify.

         MR. HORWITZ:   Yes.

Finerty - Cross

(Video played)

MR. HORWITZ:    Thanks.

BY MR. HORWITZ:

Q.    Ms. Finerty, we are looking at time stamp three seconds at the first video that we reviewed today.  You would agree that in the foreground we see two civilian protesters, correct?

A.    Yes.

Q.    And they are being pushed back, correct?

A.    Are you talking about the female in the front and then the individual with the cloth around his shoulders?  Yes.

Q.    And in the background I see at least three people with cameras.  Do you agree?

A.    Yes.

Q.    Okay.  Now you see a box truck in the left quadrant of your screen.

A.    Yes.

MR. HOGAN:    I'm sorry, what?

THE WITNESS:    A truck.

MR. HORWITZ:    A box truck.

MR. HOGAN:    A box, okay.

THE COURT:    Box truck.

And, again, Mr. Horwitz, I know it is hard.  You've got to be mic'ed because we don't have a court reporter here.  Thank you.

MR. HORWITZ:    Thank you.

Finerty - Cross

BY MR. HORWITZ:

Q. There is a box truck in the back --

A. Yes.

Q. -- correct?

A. That is correct.

Q. And extending across basically the middle half of the screen, do you see civilians standing around in the back? Correct?

A. Yes.

Q. Including Mr. Sheridan wearing I think a crop top and a bike helmet, correct?

A. Yes.

Q. How many civilians would you estimate are standing around Mr. Sheridan at that time?

A. I can't say for sure who is who. I can see at least a handful directly around him, yes.

Q. Okay. You would agree that nowhere in this video do you see Mr. Sheridan take a swing?

A. No, that's correct. I do not.

Q. And nowhere in your review of any of the evidence do you see Mr. Sheridan with a weapon?

A. That's right. He did not have a weapon.

Q. And later in this video we see Mr. Sheridan shoved by nonfederal agents over to the area off to the right of the screen, is that correct?

Finerty - Cross

A.   That's correct.

Q.   And during that shoving, you see Mr. Sheridan with his hands toward his chest in a defensive position, correct?

A.   Across his chest?  I believe so.  I can't recall exactly where his hands were.

Q.   Kind of in a standing fetal position.  Is that what you would say?

A.   Standing, yes.

Q.   In your complaint, Agent Epperson said that he saw Mr. Sheridan take a swing at Chief Bovino, correct?

A.   He said he thought he saw him take a swing at Mr. Bovino, yes.

Q.   And as a federal agent, he knows that the information that he gives to another federal agent will be relied on in a prosecution?

A.   Yes.

Q.   And he knows that the information that he gives is supposed to be truthful.

A.   That's correct.

Q.   And accurate?

A.   Yes.

Q.   And complete?

A.   Yes.

Q.   And he is not making guesses in his interview with you, a federal investigator, correct?

Finerty - Redirect

A.    He stated in his peripheral he thought he saw him --

Mr. Sheridan take a swing at Chief Bovino.  That is exactly

what he said.

Q.    Okay.  Chief Bovino was not able to recall anything in

agreement with that, correct?

A.    He agreed that he pushed him and that is another statement

that Border Patrol Agent Epperson made.

Q.    As far as Epperson's allegation that Sheridan took a swing

at Bovino, Bovino could not recall that happening, correct?

A.    He said that he did not take a swing at him, that's

correct.

Q.    Thank you.

        MR. HORWITZ:    Judge, I have nothing further at this

time.

        THE COURT:    Thank you.  Mr. Hogan, do you have any

redirect.

        MR. HOGAN:    Just very briefly.

REDIRECT EXAMINATION

BY MR. HOGAN:

Q.    First of all, regarding the time stamp on the second video,

the one that was the body-worn camera, it shows 10:21 on the

pictures that you just looked at.  The time discrepancy between

the time stamp on the video and what you testified as to the

incident occurring around 9:21, what is the basis for that?

A.    Sure.  It is, as I stated before, Border Patrol

Agent Epperson, he is stationed in Erie, Pennsylvania. They are an hour ahead. It is his body-worn camera. So the time would have been 9:21 central standard time.

Q. It just wasn't re-synced when he came.

A. Right. It's his camera from his office.

Q. All right.

And the second question is Border Patrol Epperson said that it was his -- from his peripheral vision it looked like Mr. Sheridan took a swing at Border Patrol Chief Bovino. Right?

A. Right.

MR. HOGAN: Nothing further.

THE COURT: Anything further, Mr. Horwitz.

MR. HORWITZ: Not based on that, Judge.

THE COURT: Okay. Thank you to our witness. You are excused.

(Witness excused)

THE COURT: Mr. Hogan, do you have any other witnesses?

MR. HOGAN: No.

THE COURT: Mr. Horwitz, are you planning to present any evidence?

MR. HORWITZ: No, Judge.

THE COURT: Okay.

Mr. Hogan, do you want to give argument?

MR. HOGAN: Very briefly, your Honor.

THE COURT: Okay. Wait. This is why -- I'm not trying to cut you off. I just wanted to confirm that you wanted to provide argument.

Mr. Horwitz, did you also want to provide argument?

MR. HORWITZ: Yes.

THE COURT: I have to reconvene this detention hearing in five minutes. I apologize. I did not anticipate a prelim taking this long. I think I also just didn't estimate the length of the video that we would be watching in court. So I apologize for all of these stops and starts today. But I've got a defendant in custody and marshals coming, and I would like to just finish this detention hearing.

Can I ask you all to come back at 2:30?

MR. HOGAN: Sure.

MR. HORWITZ: Yes.

THE COURT: Okay. We are adjourned until then. Thank you, everyone.

(Recess)

THE CLERK: All rise. This court is back in session.

THE COURT: Thank you.

So we are back on the record.

I just want the record to reflect I had asked the attorneys if I could see the second video that was played in court today, and so defense counsel tendered a thumb drive with

that video. I just want to be clear that I have that.

I want to hear argument now and, Mr. Hogan, if you could proceed, please.

MR. HOGAN: I will, your Honor, and I will be very brief.

I really just want to refer to the facts that are adduced in the complaint by Special Agent Finerty in which she relates that actively, I believe, that's reflected in the video the Court has just said that you rewatched during the break, at about the 16:04 mark of the body camera worn by Agent Epperson that Mr. Sheridan was standing with his arms across his body. He was directed clearly to move back. He was with other agents. Agent Epperson and Agent Bovino nudged Mr. Sheridan back and then put his hand on his chest to direct him back without any pushing or shoving or pressure that was particularly evident.

He was then directed by Agent Bovino to "move back or you are under arrest," that is a quote from the video, and Mr. Sheridan is seen there not moving back and is heard on the recording saying "there are people behind me, you fucking idiot." There were no people behind him. It is clear from the video. Mr. Sheridan could have easily stepped back at that point without any further contact with the agents.

And Agent Epperson then directed him to move back again and put his hand on Mr. Sheridan's arm and chest in an

attempt to move him back. Mr. Sheridan did not obey the commands at that point, and at that point Mr. Bovino engaged him more directly and Mr. Epperson clearly saw Mr. Sheridan shove Agent Bovino.

In contrast, by the way, I might add, to something that was brought out by Mr. Horwitz on cross-examination in paragraph 11, it reflects that Mr. —— Agent Epperson said from his peripheral vision it looked like, looked like, Mr. Sheridan took a swing at Mr. Bovino. He did not actually say that he saw it, but that it did look like. He then, though, further states that he did in fact witness Sheridan push Agent Bovino back. And there is a distinction there. One, he kind of saw in the peripheral vision, he wasn't really clear about that because he was engaged with another party at that point, but then he definitely saw Mr. Sheridan push Agent Bovino. At that point it was when Agent Bovino fell forward and engaged Mr. Sheridan on the ground and he was arrested and taken into custody.

Similarly, Agent Bovino said that he had seen Mr. Sheridan earlier that morning. As we saw in the earlier videotape, the YouTube tape, Mr. Sheridan was in fact engaged with law enforcement officers. It took three of them to move him out of the restricted area when he was clearly resisting at that point. He might not have been pushing against somebody. He was standing very stiffly and dragging his feet and had to

be forcibly ejected from the street area by three different police officers, whether county or what agency they were wasn't clear. I don't think they were Illinois State Troopers, but they were engaged in the same activity that the Illinois State Troopers were. And Agent Bovino testified or said to Special Agent -- Supervisory Special Agent Finerty that he had in fact seen Mr. Sheridan earlier that day actively resisting verbal commands and physical attempts by law enforcement to move him back. I think that that is reflected in the earlier video that we saw, the YouTube video.

Mr. Bovino then engaged -- back when he was personally involved with Mr. Sheridan, standing next to Agent Epperson, he attempted to move Mr. Sheridan back with his hands, and Sheridan at that point pushed him back, and that is when Agent Bovino and other law enforcement officers brought him to the ground and placed Mr. Sheridan under arrest. He accurately and honestly told Special Agent Finerty that Mr. Sheridan did not actively swing at him but did in fact push him back and resisted him. It is notable that there were many other people in the video. Not all of them were arrested obviously. The reason was because they complied with law enforcement orders and legitimate commands by law enforcement to clear the area and to make it safe for vehicles and for the other agents.

Mr. Sheridan, on the other hand, despite his impressive educational background and his obvious understanding

of English, deliberately refused those instructions and engaged with Agent Bovino and forcibly resisted him and they went to the ground with the result being that Agent Bovino wound up in the hospital, having an MRI, and is now on bedrest as a result of that. Now, whether or not that contact with Mr. Sheridan is the direct single, sole proximate cause of Agent Bovino's injury, groin injury, is not determined now because he is not here to tell us about it. But, as he told Special Agent Finerty and she testified in direct response to this Court's questions, that it was Mr. Sheridan's activities that caused a direct part of the injury that he incurred that day.

Mr. Sheridan has clearly violated the statutory provisions of forcible assault or forcible impedence and obstruction of a law enforcement agent and he has caused physical contact in that regard, as is charged in the complaint, and he is clearly -- there is clear probable cause to believe that those actions occurred, and that should be the Court's finding.

THE COURT: So, when you look at the complaint affidavit and this, again, was confirmed by the agent's testimony today, this really boils down to paragraph 13 of the complaint and the last line in the last sentence and this, again, is referred to in that complaint anonymized as Agent B, but that's Chief Bovino, "and Border Patrol Agent B," so Chief Bovino, "stated that Sheridan did not actively swing at him but

pushed back and resisted him." And I am looking at the pattern -- Seventh Circuit pattern instructions right now. There are definitions. And the pattern instruction for "forcibly," which is the qualifier for all of these terms, "assaulted, resisted, opposed, impeded, or interfered with a federal officer," but the pattern instruction "forcibly" says "'forcibly' means by use of force. Physical force is sufficient, but actual physical contact is not required. A person also" -- this is just continuation of the instruction. "A person also"——this is bracketed——"also acts forcibly if he"——and then brackets——"attempts to inflict"——end bracket——"bodily harm upon another with the present ability to inflict harm." The government's position is it is that push that Mr. Sheridan is alleged to have pushed on Chief Bovino, that that push alone is what? Forcible what? Forcible assault?

MR. HOGAN: Forcible interference at the very least.

THE COURT: And that push is sufficient for the forcible?

MR. HOGAN: It is certainly forcible resistance and forcible opposition and a forcible interference. And, yes, any time you push someone, you are necessarily using force. The statute says "resistant, opposing, or interfering." I am not saying that he necessarily assaulted. I mean, we can argue about what "assault" means. There is a definition of that in

the pattern instructions, too. I didn't bring them with me today, but I recall that it probably requires a little bit more than just a push. But, in any case, there is no question that there is a use of force when you push back or push to resist the lawful directives and efforts of a law enforcement officer.

THE COURT: Does it matter who initiates? Like, the fact that it was in response to a push from -- which is undisputed, that it was the officers pushing first, does that matter who initiated it?

MR. HOGAN: I don't think so. I mean, you saw a number of other people who were being pushed back who certainly did not resist. And, for example, Mr. Sheridan himself, we saw clearly in the video from Officer -- or from Agent Epperson, Agent Epperson pushed him back, and Mr. Sheridan did not resist in any kind of forceful manner. He stepped back at that point. It was only when Officer -- Agent Bovino pushed that Mr. Sheridan forcibly resisted. That is what is charged in the complaint and that is a crime.

THE COURT: Okay. Mr. Horwitz.

MR. HORWITZ: I kind of want to continue on that line, and I would direct the Court to the Seventh Circuit Criminal Pattern Jury Instruction 4.06, which cites *United States v. Graham*, 431 F.3d 585, which is a 2005 Seventh Circuit case. And to establish that a defendant acted with knowledge, the prosecution must show that "the defendant realized what he was

doing and was aware of the nature of his conduct and did not act in ignorance, mistake, or accident."

I think that is part of this question, too. In the chaos of a huge gathering of people, was there -- was there a knowing movement, was the *mens rea* requirement met to show that a reasonable person would believe that this crime has happened. And obviously we believe the answer to that question is no. But I think the Court should consider that as well.

The government's case is reliant solely on the word of two officers. I think it is important to, as a starting point, acknowledge that we heard Customs and Border Patrol has plenty of body-worn cameras to go around. That was the testimony of the HSI agent. Chief Bovino was not wearing a body-worn. The other agent, Epperson, was wearing a body-worn and, despite what he is able to apparently recount in some detail, I suppose, to the investigator, nothing included in the complaint appears on his camera other than that he was there, Cole Sheridan was there, Mr. Bovino was there. And so I think the level of proof that the government has shown to the Court just from a threshold point is lacking.

The government showed two videos today, and while we objected to the first one, ultimately I think I am glad that the Court saw the first video. Factually, it has nothing to do with this case. The first video from the government is preceding in time. I am not exactly sure when it was. The

government ranged from 30 to 120 minutes. It was certainly on the same day and certainly part of the same event. I think the reason that the government wanted to show that was to show Mr. Sheridan's propensity to act in a certain way and his propensity not to follow court orders. But I actually think that what the Court should draw from that video supports what we are arguing, which is that there is no probable cause from the actual incident, which you did not see in that video——was no swing, no weapon, no violent conduct. Frankly, what you saw was an individual standing in the background, staring, just standing there and observing. He goes off camera and then he is forcibly removed. Nowhere in that do we see anything other than Mr. Sheridan trying to keep his balance. He does not resist. I just think that, frankly, the government's description of what happens in that video is not somebody resisting or dragging their feet. I think this is somebody going with the physical force that is putting them back on the grass where law enforcement wants them to go.

So as far as the propensity of Mr. Sheridan's actions that the Court can infer from that, I think what we have seen is physical force applied by law enforcement, no physical force returned, which, when taken to the question of what actually happened as it relates to the events in the complaint, not only is there nothing to support the inference that this person responded with force back to law enforcement, but we have an

example of him having physical force applied to him within the preceding hour or two and him kind of curling into what the agent admitting was the standing fetal position. So I think that that undercuts the government's position as to what happened during the actual incident in this case.

The story from October 3 continues, and I apologize for making the Court sit through the 17 minutes that we asked the Court to consider, but I think it is important to see how that video started. This was a wildly performative event from Customs and Border Patrol. I thought that your Honor was able to hear it in chambers, a male voice. Again, we don't know if it was Mr. Bovino or not. By Mr. Bovino leading this group of agents out from the parking lot, it is certainly reasonable that it would be him to say, "Walk slowly." We have internal camera members taking video and photos. They are documenting this as an event of the show of force that it is, that we have agents who are standing around, over a hundred yards away from the actual protest, you will have the peace of mind that nothing violent is happening at the time, that they can slowly perform this big walk towards the protesters before they decide what to do next.

And I think it is important for the Court to take that into account as far as the kind of tenor of the day, what it was that the federal agents were doing there in the first place, and the scene that the agents went to when they first

arrived.

When they first arrived, they are standing around and waiting for instructions. We don't see a chaotic scene. We don't see ICE, PD asking for help, or Broadview Police Department struggling to control the people. What we see is protestors standing still; speaking, as they are allowed to do; gesturing, as they are allowed to do; and, seemingly, on the sides of the road that seems to be in contest of whether or not this road needs to be blocked or unblocked.

One of the things the Court needs to consider is what were the official duties that the federal agents were doing on that day and we talked a little bit about the perimeter that was set. We talked about where were the protesters allowed to be and where were they not allowed to be. You heard from a supervising federal agent whose job was to supervise at least one agent who was there on the frontline, you know, making arrests when needed of these folks, and the supervising agent could not tell you where the protesters were allowed to be and where were they not allowed to be.

Agent Finerty, I think, ultimately conceded, although we struggled with this for a moment, that I think Mr. Sheridan's feet were on the grass at the moment that this incident happened. And so what we have is an allegation that federal agents were needed because state authorities could not control the public way, as Mr. Hogan described it, and the

federal authorities came to keep people on the sides. But at the moment that the alleged incident occurred, we have undisputed testimony that Cole Sheridan was on the grass, where I think it is undisputed where he was allowed to be.

The agent testified that people were not allowed to be on federal land or private land and, from what we heard from the agent, the grass, the sidewalk, that was public land at the time. And so I think it is -- there is no evidence as to whether there was any kind of open official order or duty to clear people from the public area. I don't think there is evidence to support that.

THE COURT: Mr. Horwitz, from my limited inquiry, the prelim is so narrow as far as what I am considering. And whether or what the perimeter was, you've got law enforcement officers who are moving the protesters. Is it appropriate for me to be considering whether or not their decision to move the protesters in that location was lawful or within the perimeter or outside the perimeter? Is that appropriate for my consideration right now. For this limited purpose, is there probable cause?

MR. HORWITZ: I think it is in the sense that there is not a clear indication or explanation from the government about what the order was for where these people needed to go, and I think it undercuts the main witness whose testimony we are getting secondhand, which is Mr. Bovino, who shows up and tells

people to clear off and back up. That was the order. He said: Back up or you will be arrested. He said it multiple times. He said it to multiple people.

But, you know, the idea that there was resistance from Mr. Sheridan, I think, is unfounded and that the government is saying, you know, not only was there this push, but he was not listening to what Mr. Bovino was saying. I think it undercuts the credibility of what is coming primarily from Mr. Bovino.

So I do think it is appropriate for the Court to consider what the agents were doing there as it relates to the story that we are getting through Agent Finerty from Mr. Bovino.

And so the two exhibits that I presented to the Court, I am happy to show them more, in my view those are photographs of a largely cleared street, where the agents are justifying their presence on the street, when I even see daylight down the street. There is no chaos. There is no confusion. And so I think this is an incident that is instigated by the federal authorities, that is started by federal authorities. They didn't need to be there. And the reason that that is important for the Court to consider is because this case comes down to the credibility of Mr. Bovino.

THE COURT: But is credibility appropriate for me to consider? Isn't that a question for the jury?

MR. HORWITZ: I think it is not. If what we are

saying is you can only consider the credibility, sure. I don't think the Court can base the probable cause determination solely on the credibility of a witness. I don't think that would be proper. However, the Court has not seen any evidence in what we have seen of many cameras, many witnesses. We have not heard from somebody who has been shown, in my view, to be believable or firsthand information presented to this Court. So I think there is a lack of evidence. And, on top of that, the secondhand evidence that is coming to the Court, I can't give credence to that.

So I think credibility is at issue here. I am not saying that that is the totality of what our argument is. But I think it is at issue. I mean, let's not forget, the government is trying to smooth over this blatant discrepancy between the stories of Epperson and Bovino. "I saw out of my peripheral that somebody swung at the chief of my department," and he says, no, that didn't happen? I mean, I don't know how to square that. Those are both in the complaint, and the government is saying: Don't worry about that; that is not that big a deal. He said he thought that might have happened, and then he said in fact he wasn't sure. I just don't think that we can overlook the fact that the complaint and the allegations in the complaint itself is contradictory.

I'm not going to dwell on the groin injury to Bovino. I think that is irrelevant to the case here, and I would just

ask the Court to take that for what it is.

I think the Court should consider that Agent Finerty -- you know, we found out that Agent Bovino was the alleged victim in this case at 11:00 last night and, in the ten hours that we had before we came to Court this morning, my office and I——untrained investigators——were able to find a number of allegations calling into account this person's character for truthfulness, prior acts of dishonesty, and a host of other things that would lead, I think, a reasonable investigator to question the sole, uncorroborated source of a criminal allegation that is being made.

So while Agent Finerty was not able to look into those allegations, they are readily available. She certainly has more resources to investigate the veracity of the claims made by Chief Bovino than I do, and I think it should be taken into account as far as her investigation is concerned, as far as her just saying what the witnesses said to her and not looking under the hood about where those allegations come from. I think the Court should consider that against the government.

Now, the government is asking the Court to basically just take our word for it, and I think that was apparent as the testimony came out today. We heard a lot from Mr. Hogan about what his impressions of the videos are. We heard a lot from Agent Finerty about what she has seen in the videos. But, at the end of the day, the video speaks for itself. And we

discussed this in the hearing, that the rules of evidence effectively do not exist at a preliminary hearing. What I would ask the Court to consider, what it means, that the government is bolstering its case with the impressions of the prosecutor and the agent who does not have firsthand knowledge of being there. And the takeaway from that is the Court can see the video for itself. And I do not think that the allegations being made by the government of what Mr. Sheridan was doing at the time are supported by what is in the video.

And I would just ask for my HDMI to be connected very briefly.

THE COURT: Just make sure you are by a microphone, Mr. Horwitz. Thank you.

MR. HORWITZ: We are looking at a still of the body-worn camera footage. This is at -- on the video timeline, it is at 16:30. As far as the body-worn timeline, it is 10:23:15. We are looking at the midriff of Cole Sheridan. We are looking at the -- I believe it is the right hand of Agent Epperson and the kind of rear right of Chief Bovino standing in front of somebody in a red shirt.

What I would direct the Court's attention to here is the person directly behind Cole Sheridan wearing a gray -- it looks like a long-sleeved T-shirt. The government claims there was nobody standing behind Mr. Sheridan, he was actively resisting, and he could have just moved back, he should have

moved back, just like everybody else. Judge, the video speaks for itself. It's clear there was a person standing directly behind him.

And so the question for the Court is, you know, we don't see anywhere in this video him pushing back and we had the very reasonable explanation for why he didn't move back. And this alone undercuts the government's assertion that this guy was an agitator and causing trouble and just being a pain in the rear end for ICE agents. It is clear that he was physically incapable of retreating at this time.

Now, if the agents went around to everybody else, they were able to clear people out, where there was space for those people to back up, we have undisputed testimony that at this moment Cole Sheridan was standing on the grass. So I am just asking for the Court to consider was it within the official duties for this agent to do what he is doing? I don't think so. Was it physically possible for Cole Sheridan to move backwards at this time such that his refusal to do so reflected an intent to forcibly impede, resist, oppose, assault a federal agent? The answer to that question is no as well.

The investigation into this case I don't think was thorough enough to put the Court at ease that what the government and its agent are saying happened actually happened, and the evidence that we have I think certainly calls into question that it actually happened, and I just don't think that

there is enough to support. If what the government is saying happened happened, there would be better evidence to support it, and that is not what we have here. We have uncorroborated allegations from second-hand witnesses, and that is not enough for the government to meet its probable cause burden.

THE COURT: You brought up an element about official duties, so you are arguing that, because of the location of where Mr. Sheridan was standing and the other argument you have offered today as far as the genesis of the agents moving the protesters, etc., that that establishes or that the government has failed to establish that Chief Bovino was acting in the course of his official duties? Are you disputing that element, as well?

MR. HORWITZ: Yes. I don't think -- there was no forcible conduct based on what we have here. Even taking at face value what the allegations are coming from the government's agent, there are significant reasons to doubt it that don't allow it to meet the probable cause standard. And I think we also -- it calls into question whether Chief Bovino was acting in his official capacity or merely just doing something outside of that capacity.

THE COURT: Well, are you done, Mr. Horwitz?

MR. HORWITZ: Yes.

THE COURT: Mr. Hogan, anything you want to say in response.

MR. HOGAN: I do, your Honor.

THE COURT: Okay.

MR. HOGAN: First of all, with regard to the statute requirement, there is no requirement for specific intent in the statute. It is clear it is a general intent crime. So that argument is not availing at all. And there is no knowingly requirement.

Second of all, with regard to the -- Mr. Horwitz's arguments regarding the two videos, the first video he said that there was no force employed. That is true. Mr. Sheridan, in that one, is turned with his back. He is passively resisting. He has got his arms by his sides or across his chest. But it takes three officers to shove him out of there. He is clearly engaged in resistance at that point. It is just passive. As opposed to the second video where there is -- so there wasn't any force employed by Mr. Sheridan in that one. But there was certainly in the second video where the allegation by Agent Bovino is, as the Court already recounted, in paragraph 13, that "Sheridan" -- quote, "Sheridan pushed him back." He pushed him and he said again, that Sheridan pushed him back and resisted him. Those are the requirements for the use of force in 111(a)(1). And this video, the second video, shows that Mr. Sheridan is standing there, he is being shoved. Even in the picture that Mr. Horwitz just showed us, his hand -- he is not complying with an order by Agent Epperson to

move back. He is just standing there. The angle that Mr. Horwitz showed in the still photo is not the same as depicted in the video when, shortly before that, where there is a clear space behind Mr. Sheridan, he could have easily stepped back.

Mr. Horwitz argued that there was a chaotic scene there and we saw the one, whatever it was, 16 minutes of the beginning of the video. What that shows clearly, most notably, is that there were dozens of people that were complying with lawful orders by the agents who were involved that day. They were moving at direction out of the way. They were complying with orders by the agents. They were picking up their belongings. They were picking up their water bottles. They were picking up their canisters and their other bags and backpacks that they had. One of them had a big thing on wheels that had probably water or something in it. They were complying with the instructions. They were not engaged in any kind of aggressive actions whatsoever, all but the defendant and a few others that were in fact resistant. They were arrested because they were engaged in forceful resistance.

The fact that Agent Finerty didn't testify about the line -- the areas that were restricted or that the protesters weren't allowed to go into, as she said, was clearly not her job. I think that that is another red herring. It doesn't matter. The fact that they were -- the protesters were on the

grass, if they were near the restricted areas or near the street, the agents were still involved in their lawful duties and protecting the ingress and egress of the area. Agent Bovino was clearly involved in that kind of official conduct, so that argument is also not availing.

Mr. Horwitz argued that, again, there is an alleged contradiction between whether Agent Epperson actually saw a swing by Mr. Sheridan. He clearly did not say in his -- in the recitation in the affidavit that he actually did witness a swing. He said he looked like it. He was very specific in the language that was used, that he thought he saw out of his peripheral vision that there was a swing, but he never says definitively that there was a swing. The contrast is that he did in fact say that he did definitively witness Sheridan push Agent Bovino back in response to Agent Bovino trying to move him out of the area.

So the fact that there is an alleged contradiction there is simply a misrepresentation by Mr. Horwitz. It is an overstatement and it is unnecessary. And what it does is clearly portray the weakness of his argument. You don't need to engage in weak, misleading arguments if you have a good case.

There is no evidence whatsoever in this that is adverse to Mr. Bovino except from the unfounded questions by Mr. Horwitz. I don't know what he dug up on the internet. He

gave us a copy of something in the middle of this examination here. It's not from a newspaper. It's just some Internet stuff that has who knows what about Agent Bovino and what the source is. But there is certainly nothing substantial about it. And, again, to make that kind of an argument in these circumstances betrays the weakness of his overall argument. You don't need to engage in misleading and weak arguments when you have a good case. That shouldn't be taken into account whatsoever.

Finally, Mr. Horwitz, once again, you know, he says——this is a quote——that Mr. Sheridan was physically incapable of moving backwards. That is clearly not the case. The Court has reviewed that video a couple of times. If you have any doubts about it, you can go back, please, and review it again before you reach your decision. But there was clear room behind Mr. Sheridan. He could have stepped back. He purposefully chose not to. He purposefully chose to resist. It is just a simple -- you know, it's one thing to overstate things a little bit, another thing to exaggerate things, it's another thing to misrepresent them, and that is a deliberate misrepresentation by Mr. Horwitz.

So, for all those reasons, we urge the Court to reject the defendant's arguments and to find that there was probable cause, as you have already done.

THE COURT: Mr. Horwitz, anything else you want to

say?

MR. HORWITZ:    Not to that, Judge.  Thank you.

THE COURT:    I am going to ask for the video again and I am going to rule tomorrow.  I just want to look at the video one more time and consider the arguments that were made today. I am intending to rule on the record tomorrow.  We can do it telephonically to save everyone a trip from coming back into the courthouse.  I just need ten or 15 minutes.  I will do it in person if you prefer, but I can do it by phone as well.

12:45, does that work for you?

MR. HOGAN:    That's fine.  And I don't care.  I'm here any way, so --

THE COURT:    I am trying to save Mr. Sheridan an extra trip down here.  But if you prefer to do it in person, I will do it in person.

MR. HORWITZ:    The phone is fine, Judge.  Thank you.

THE COURT:    Okay.  So it will be 12:45 tomorrow.  The call-in information will appear on the docket.

I'm sorry.  It's just been one of those days.  I gave the thumb drive back, right?

MR. HOGAN:    I think you did.

THE COURT:    Unless you want to tender the exhibits separately, may I utilize that thumb drive again?

MR. HORWITZ:    Can you double check that I have it or that you don't have it, I should say?

THE COURT: Oh, I still have it. I have it. So I am going to keep this. And just from my review of it, it's just a video, Mr. Hogan, so it's just the second video.

MR. HOGAN: That's fine. I can try and get it on the docket, but --

THE COURT: I don't think I will be able to access it on the docket. The video is typically -- I don't want to talk about ECF on the record, but I would rather just use this thumb drive as long as both sides are comfortable.

MR. HOGAN: Absolutely.

THE COURT: Okay. I will talk to you at 12:45 tomorrow.

Thank you for your time today. I'm sorry it was so piecemeal today. It's just been continuous.

MR. HOGAN: I'm sorry about my delay, your Honor. I got stuck in front of -- on a sentencing with Judge (indiscernible).

THE COURT: I think we are all just trying to juggle a lot of things right now this week, so I understand.

Mr. Horwitz, were you going to say something?

MR. HORWITZ: I was. I know that I have another preliminary hearing in front of your Honor tomorrow at 1:00. Can I come and take the call in court? Does your Honor do that from the bench?

THE COURT: I will come back on the bench, but it is

by phone. I am not requiring an in-person appearance. So, Mr. Hogan, you are also welcome to come to the courtroom, as long as you are in the courthouse, but my point is I am trying to save Mr. Sheridan another trip down here.

MR. HOGAN: I don't have any problem waiving his presence.

THE COURT: Mr. Sheridan, the phone line will be open if you want to call in.

THE DEFENDANT: Thank you, your Honor.

THE COURT: Thanks, everyone.

MR. HORWITZ: Thank you.

THE COURT: We are adjourned. Thank you.

(Concluded at 3:41 p.m.)

INDEX OF EXAMINATION

Examination of:                                                    Page

 JENNIFER FINERTY

Direct By Mr. Hogan . . . . . . . . . . . . . . . . . 6

Cross By Mr. Horwitz . . . . . . . . . . . . . . .45

Redirect By Mr. Hogan . . . . . . . . . . . . . . .70

* * * * *

        I certify that the foregoing is a correct transcript of the

digital recording of proceedings in the above-entitled matter

to the best of my ability, given the limitations of using a

digital recording system.


*/s/ Kristen J. Carannante*
October 19, 2025
Kristen J. Carannante, RPR, RMR, FCRR
Court Reporter/Transcriber